STATE of Wisconsin, Plaintiff-Respondent,

v.

Julius James NASH, Defendant-Appellant.†

Court of Appeals

*No. 84–945–CR. Submitted on briefs December 17, 1984.—*
*Decided February 6, 1985.*
(Also reported in 366 N.W.2d 146.)

† Petition to review denied.

For the defendant-appellant, the cause was submitted on the briefs of *Charles S. Blumenfield,* of *Shneidman, Myers, Dowling, Blumenfield & Albert,* of Milwaukee.

For the plaintiff-respondent, the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *Stephen W. Kleinmaier,* assistant attorney general.

Before Scott, C.J., Brown, P.J., and Nettesheim, J.

BROWN, P.J. The defendant, Julius James Nash, appeals his conviction of first-degree murder, party to the crime, for his participation in the execution of Felix Winters. We affirm.

This case has a long and somewhat involved factual history. These facts are recited in *Neely v. State,* 86 Wis. 2d 304, 272 N.W.2d 381 (Ct. App. 1978), *aff'd,* 97 Wis. 2d 38, 292 N.W.2d 859 (1980), *Haskins v. State,* 97 Wis. 2d 408, 294 N.W.2d 25 (1980), and *Nash v. Israel,* 533 F. Supp. 1378 (E.D. Wis. 1982), *aff'd,* 707 F.2d 298 (7th Cir. 1983). Therefore, they will only be briefly summarized here.

Julius Nash originally pled guilty to the crime of first-degree murder for his involvement in the shooting death of one Felix Winters. After exhausting his state remedies, Nash filed a petition for writ of habeas corpus in the federal district court, seeking to have his guilty plea withdrawn. Nash asserted that, as a matter of law, the record of the guilty plea proceeding was inadequate to establish that he understood (1) the nature of the charge, or (2) the consequences of his plea. The district court agreed and granted the writ of habeas corpus, ordering that Nash be permitted to withdraw his plea. *Nash v. Israel,* 533 F. Supp. 1378 (E.D. Wis. 1982). The judgment was stayed for ninety days to allow the state to either try Nash or dispose of the matter against him by other means. The judgment was also stayed pending the resolution of the state's appeal to the circuit court of

appeals. That court affirmed the decision of the district court on May 19, 1983. *Nash v. Israel,* 707 F.2d 298 (7th Cir. 1983).

Nash's trial began on September 26, 1983. Four days later, the jury returned a guilty verdict to the charge of first-degree murder, party to the crime.

The first issue raised on appeal involves the order of the district court granting Nash's writ of habeas corpus. The order stated:

It is Ordered and Adjudged that the petitioner be permitted to withdraw his plea of guilty. Judgment will be stayed for 90 days to allow the state to give Nash a trial or to dispose of the matter against him by other means.

Although this period was stayed pending the appeal to the circuit court of appeals, that court's decision affirmed the district court in all respects. Nash argues that because the trial was held more than ninety days after the May 19 federal circuit court decision, the trial court was without jurisdiction to try the case, rendering the verdict invalid. We hold that the expiration of the stay does *not* deprive the state court of jurisdiction to retry the case.[1] The only practical effect of the issuance of the writ (or the expiration of the stay) is the release of the prisoner from custody, as there are no longer any legal grounds to detain him or her. And as to that, we hold there was waiver.

The district court's order permitted Nash to withdraw his plea of guilty. This determination was stayed for

---

[1] *See generally Keller v. Romero,* 303 So. 2d 481, 484–85 (Miss. 1974) (habeas corpus may not be used to bar further prosecution for the charged offense), and *Stynchcombe v. Hardy,* 184 S.E.2d 356, 358 (Ga. 1971) (trial judge in habeas corpus proceeding lacked authority to bar any future prosecution of defendant).

ninety days to allow the state to take certain action. At the expiration of the ninety-day period, the writ would have been issued ordering the guilty plea withdrawn and releasing Nash from custody. *See Teubert v. Gagnon,* 478 F. Supp. 474, 479 (E.D. Wis. 1979).

The reason the writ was never issued is because Nash's defense counsel requested an extension beyond the ninety days since he "would be unable to get prepared quickly enough to do justice to his client if . . . this trial [is] set too quickly." Nash himself explicitly agreed to the extension on the record. Further, but for defense counsel's request for an extension, the state would have retried Nash within the ninety-day period. By agreeing to an extension, Nash excused any forthcoming disobedience of the order and waived any rights he had due to the non-compliance with the ninety-day time limit.

Nash next objects to the use of testimony he gave during previous trials involving other defendants. When Nash took the stand in his own defense, his testimony differed significantly from the testimony he gave at two trials of other participants to the murder. The trial court allowed the state to use this prior testimony for impeachment purposes. Nash maintains that the admission of this evidence violates sec. 904.10, Stats., which states:

> Evidence of a plea of guilty, later withdrawn . . . is not admissible in any civil or criminal proceeding against the person who made the plea or offer or one liable for his conduct. *Evidence of statements made in court or to the prosecuting attorney in connection with any of the foregoing pleas or offers is not admissible.* [Emphasis added.]

Nash contends that the testimony provided at the previous trials was given "in connection with" his guilty plea which was subsequently withdrawn; therefore, it is not admissible under sec. 904.10. We disagree.

Although this specific issue has not been addressed in Wisconsin, we are guided by two federal courts of appeals decisions, *United States v. Stirling*, 571 F.2d 708 (2d Cir.), *cert. denied*, 439 U.S. 824 (1978), and *United States v. Davis*, 617 F.2d 677 (D.C. Cir. 1979), *cert. denied*, 445 U.S. 967 (1980). In both of these cases, the defendants entered into plea agreements calling for them to testify before grand juries. The defendants withdrew from their plea bargains after testifying before the grand jury but before entering their guilty pleas. Each defendant claimed that the exclusion enunciated in Fed. R. Crim. P. 11(e)(6) (which is substantially similar to sec. 904.10, Stats.) prohibited the admission of the grand jury testimony. Although the federal courts conceded that Rule 11(e)(6) could be read expansively to include the grand jury testimony as being made "in connection with" the plea agreement, both courts nonetheless concluded that such a decision would be contrary to the purpose and policies promoted by the rule. *Stirling* at 731; *Davis* at 686.

The purpose of sec. 904.10, Stats., is the same as the purpose of the federal rule—to promote the disposition of criminal cases by compromise. *See* Federal Advisory Committee's Notes, Wisconsin Rules of Evidence 59 Wis. 2d at R97. The exclusion was created to allow for free and open discussion between the prosecution and defense during attempts to reach a compromise. *Davis* at 683. Both the *Davis* court and the *Stirling* court reasoned that exclusion of the grand jury testimony would not serve the purpose of the rule because the testimony was given after all of the negotiations had been completed and the plea agreement was formalized. *Davis* at 685; *Stirling* at 731–32.

The admission of Nash's previous trial testimony is consistent with this reasoning. First, the testimony was

given after the plea agreement had been reached. There was to be no more negotiation and, therefore, no more reason to promote negotiation. Second, during plea negotiations, the only interested parties are the defendant and the state. In promoting a compromise, it is reasonable to offer protection to the defendant so that statements made during the compromise cannot be used against him later. A plea of guilty does not bring with it a guarantee of the defendant's truthfulness. Often, the defendant's motivation at the plea hearing may be to obtain the benefit of the bargain, not necessarily to tell the truth.[2] However, when the defendant gives testimony before a grand jury or at another's trial, he or she is under oath and sworn to tell the truth. Oftentimes, the liberty interest of another is at stake. Under these circumstances, there is or should be a motive for truthful testimony. Failure to tell the truth in this situation should be subject to sanction. We conclude that the admission of this evidence was not erroneous.

Nash next asserts trial court error in its failure to suppress statements made to law enforcement officers on the night of his arrest. He maintains that these statements were made while he was illegally arrested. The trial court found at the suppression hearing that the

[2] One example is what is known as the *Alford* plea. In *North Carolina v. Alford,* 400 U.S. 25 (1970), the United States Supreme Court held that a guilty plea can be accepted even when accompanied by protestations of innocence.

"[W]hile most pleas of guilty consist of both a waiver of trial and an express admission of guilt, the latter element is not a constitutional requisite to the imposition of criminal penalty. An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime."

*Id.* at 37.

For Wisconsin's acceptance of the *Alford* plea, see *State v. Johnson,* 105 Wis. 2d 657, 663, 314 N.W.2d 897, 900 (Ct. App. 1981).

statements were voluntarily made prior to Nash's arrest and consequently held that the statements were admissible.

The testimony presented at the suppression hearing was conflicting. The officers testified that they went to Nash's home based upon an unnamed informant's tip that Nash "knew about the Felix Winters murder." The officers conceded that, upon their arrival, they did not have probable cause to arrest Nash. After informing Nash that they were police officers and wanted to talk to him, Nash suggested they get into the squad car. Nash was with a male companion at the time and indicated he did not want to talk to the police in front of his companion. Before he got into the car, one of the officers patted him down and read him his *Miranda* rights. He was never handcuffed. Once inside the car, Nash asked the officers to drive around the block so he would not be seen talking to them. After he completed his statement (and on the basis of that statement), the officers arrested Nash and took him to the police administration building.

Nash claims he was illegally "seized" at the time he made the statement; he asserts that he was under arrest from the moment he was ushered into the unmarked police car. He argues that he was "arrested for all practical purposes because he was not free to leave the presence of the officer[s]." We disagree.

Whether Nash was "seized" at the time he gave the statement is a question of constitutional fact. *State v. Smith,* 119 Wis. 2d 361, 366, 351 N.W.2d 752, 754 (Ct. App. 1984). The trial court's findings regarding the historical facts will not be overturned unless clearly erroneous. *Id.* at 366, 351 N.W.2d at 754–55. Whether these facts rise to the level of a seizure invoking fourth amendment protections is a constitutional fact which an

appellate court determines independently. *Id.* at 366, 351 N.W.2d at 755.

Nash is correct in stating that a person is seized within the meaning of the fourth amendment only if, in view of all the circumstances, a reasonable person would have believed he was not free to leave. *State v. Reichl,* 114 Wis. 2d 511, 515, 339 N.W.2d 127, 128–29 (Ct. App. 1983). The circumstances which are to be considered include physical contact, the threatening presence of several officers, the display of weapons and the use of language or tone indicating compliance with the officers' request might be compelled. *United States v. Mendenhall,* 446 U.S. 544, 554, *reh'g denied,* 448 U.S. 908 (1980).

First, we conclude the facts as found by the trial court are not clearly erroneous. The court found that the conversation took place in the police car because the defendant did not want to talk to police in front of his house where he might be seen by his friends or by those who were not his friends. As to the pat-down, there was testimony establishing that the area in which Nash lived was a relatively high crime rate area. In fact, the police officers testified that they knew of fellow officers who had been shot while questioning people within a several mile radius of Nash's home.

Second, upon independent analysis of the evidence in the record, we are satisfied that no seizure took place. The officer's action in patting down Nash before he entered the car can easily be justified as a precautionary measure taken for the officers' safety. It was Nash who asked that they hold their discussion in the squad car. The officers did not know Julius Nash; they cannot be faulted for taking preventative steps for their own protection. The reading of the *Miranda* rights can also be supported as an exercise of good judgment on the part

of the officers to insure the protection of the defendant's constitutional rights. A police officer's caution in giving the *Miranda* rights does not automatically convert a non-custodial situation into an illegal seizure. *See United States v. Akin,* 435 F.2d 1011, 1013 (5th Cir. 1970), *cert. denied,* 401 U.S. 1011 (1971). The police officers displayed no weapons, exhibited no physical force and there was no indication of verbal threats or statements of compulsion. *See Smith,* 119 Wis. 2d at 366, 351 N.W.2d at 755. As no seizure occurred, the statements were properly admitted.

Next, Nash contends that he was denied effective assistance of counsel. Again, we disagree.

We note at the outset that there is currently some confusion as to what standard is to be applied in ineffective assistance of counsel cases.[3] The current status of Wisconsin law is that counsel's representation must be equal to that which the ordinarily prudent lawyer, skilled and versed in criminal law, would give to a client who had privately retained his services. *State v. Davis,* 114 Wis. 2d 252, 255, 338 N.W.2d 301, 303 (Ct. App. 1983); *State v. Felton,* 110 Wis. 2d 485, 500–01, 329 N.W.2d 161, 168 (1983). Additionally, in order to find counsel was ineffective, it must be shown that the defendant was prejudiced by counsel's actions. *Felton* at 503, 329 N.W.2d at 169. Determinations of prejudice are to be made on a case-by-case basis. *Id.*

The United States Supreme Court, on the other hand, has recently enunciated a "reasonably effective assistance" standard for determining an attorney's performance. In order to successfully challenge counsel's effectiveness, the defendant must show that there is a reason-

---

[3] The question of which standard is to be used by Wisconsin courts was recently certified to the supreme court. *State v. Pitsch,* No. 84–627–CR (certified on December 12, 1984). The supreme court accepted certification on January 8, 1985.

able probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington,* 466 U.S. ——, ——, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068 (1984). It is suggested that *Strickland* presents a much more difficult hurdle for the defendant to overcome because the defendant must show a reasonable probability that the result would have been different had counsel been effective. Under *Felton,* the defendant must merely show prejudice or, in other words, that counsel's actions somehow affected the defendant's right to a fair trial. It is not our role as an error-correcting court to determine which standard governs or whether the standards are, in fact, the same. However, assuming *arguendo* that *Felton* presents a less stringent standard for Nash to overcome and acknowledging that we are bound by *Felton* at this point, Nash's claim must still fail.

The determination of whether counsel was effective involves a mixed question of fact and law. *Davis* at 256, 338 N.W.2d at 303. The trial court must first make findings of fact regarding trial counsel's actions. Next, the trial court must find what an ordinarily prudent lawyer would have done. *Id.* These findings of fact will not be reversed unless they are clearly erroneous. Sec. 805.17(2), Stats.

The trial court must then ascertain whether the defense counsel's actions fulfill the legal standard for ineffective assistance of counsel. That is to say, the trial court must determine whether counsel's representation fails to match that of the ordinarily prudent lawyer. This determination is a question of law, and an appellate court on review owes no deference to the trial court on a question of law. *Davis* at 256, 338 N.W.2d at 303.

Nash asserts five bases to be considered by this court in determining whether his trial counsel was ineffective. These allegations will be handled seriatim.

First, Nash maintains his defense counsel was ineffective for requesting an extension of the district court's ninety-day limit for trial. We have already explained that due to the voluminous record which had to be reviewed and the other preparatory work that had to be done, counsel stated he would be unable to effectively represent Nash within the ninety-day deadline. We hold that the reason for the waiver is a valid one and is the act of an ordinarily prudent lawyer concerned with having adequate time to prepare.

Second, Nash claims trial counsel failed to properly prepare him for the trial. At the post-conviction hearing, the defense attorney testified as to numerous conversations with Nash. The record and the trial court's findings clearly show that defense counsel met on several occasions with Nash and attempted to prepare him for trial. We agree with the trial court that defense counsel's actions represent the actions of an ordinarily prudent lawyer in preparing an adequate defense for the accused.

Third, Nash maintains his attorney was ineffective for calling adverse witnesses who presented testimony damaging to Nash's defense. Nash made several statements, two of which were under oath, that were incriminating to his current position. At trial, defense counsel was seeking to show inconsistencies in and between the statements of the state's witnesses in the hope of attacking the credibility of the state's case. It was necessary to point out inaccuracies in the state's case in order to bolster the credibility of Nash's trial testimony. We see this attempt as a legitimate trial strategy that appears reasonable and within the scope of the ordinarily prudent lawyer standard.

Fourth, Nash claims his counsel was ineffective for failing to introduce certain medical records. Defense counsel explained that, although he had medical records in his possession that showed Nash was suffering from

heroin withdrawal the night he gave his statement to the police, those records were not introduced because not only had the state conceded Nash's condition at the time the statement was made but also the records did not indicate the severity of the withdrawal symptoms. The records did not provide any additional information and might have worked to weaken Nash's allegation of heroin withdrawal. As this is a reasonable basis for deciding not to introduce the medical records, counsel was not ineffective. *See State v. Fencl,* 109 Wis. 2d 224, 229, 325 N.W.2d 703, 707 (1982).

Fifth, Nash's counsel did not request that an intoxication instruction be given. This is consistent with his theory of the defense that Nash was a bystander and not an active participant in the murder. Further, before the intoxication instruction can be given, "[t]here must be some evidence that the defendant's mental faculties were so overcome by intoxicants that he was incapable of forming the intent requisite to the commission of the crime." *State v. Strege,* 116 Wis. 2d 477, 486, 343 N.W.2d 100, 105 (1984). Nash's memory of the events which took place that evening were vivid and detailed. The evidence introduced would not have supported an intoxication instruction. Therefore, it cannot be said that defense counsel erred in failing to request this instruction.

Nash's final claim of ineffectiveness of counsel is that defense counsel failed to cite sufficient legal authority at trial. However, as conceded by Nash, the defense was a factual defense, attacking the credibility of witnesses, not a legal defense. Further, the court did not express any confusion as to defense counsel's position on tactical matters. In short, there appears to have been no reason for counsel to inundate the court with statutory or case citations to support his legal theories. One certainly

should not gauge the effectiveness of defense counsel on the quantity of citations given.

Nash next maintains that the trial court erred in failing to instruct the jury on second-degree murder. However, the theory of defense centered upon Nash's alleged non-participation in the murder. Had the jury believed Nash's story, he would have been acquitted. We see nothing in the facts which would allow for the reasonable likelihood of acquittal on the greater charge and conviction on the lesser charge. *See Hawthorne v. State,* 99 Wis. 2d 673, 682, 299 N.W.2d 866, 870 (1981).

Finally, Nash asserts that the trial court erred in failing to suppress the statement made to the police at the time of his arrest. Nash maintains the statement was made involuntarily—first, because he was undergoing drug withdrawal; and second, because the statement was to be exchanged for a "pass," presumably to allow him to be taken to the hospital.

The trial court found, at a hearing, that the defendant was not promised immunity and that the discomfort the defendant was suffering was not of such a nature as to cause the defendant to do or say things he did not freely and voluntarily want to do or say. This finding is not clearly erroneous. Sec. 805.17 (2), Stats.

*By the Court.*—Judgment and order affirmed.